UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                                    :
AEGIS CAPITAL CORPORATION,                          :
                                                    :
                                Plaintiff,          :
                                                    :
                -v-                                 :          25 Civ. 9938 (JPC)
                                                    :
DIGITAL ALLY, INC.,                                 :          OPINION AND ORDER
                                                    :
                                Defendant.          :
                                                    :
-----------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

   Plaintiff Aegis Capital Corporation ("Aegis") moves for a temporary restraining order and

a preliminary injunction against Defendant Digital Ally, Inc., for allegedly breaching a contractual

right-of-first-refusal provision.  *See* Dkt. 1 ("Compl."); Dkt. 6 ("Motion").  But because any harm

from such a breach can be compensated with money damages, Aegis has not shown the kind of

irreparable harm needed for its requested equitable relief.  So the Court denies Aegis's motion.

## I.  Background

### A.    Factual Background[1]

   Aegis is an investment banking firm that assists private and public companies with capital-

raising and corporate-finance services.  Compl. ¶¶ 31-32.  As part of those services, Aegis acts as

the lead or sole underwriter and placement agent for public offerings and private placements of

debt and equity securities, a role which includes refinancing its corporate clients' outstanding debt.

---

[1] When resolving a motion for a temporary restraining order and a preliminary injunction, "a court may consider the entire record including affidavits and other hearsay evidence." *J.T. v. de Blasio*, 500 F. Supp. 3d 137, 181 (S.D.N.Y. 2020) (internal quotation marks omitted).  The Court accordingly considers the declarations and attached exhibits the parties submitted in connection with the motion.  *See* Dkt. 7 ("Eide 12/1 Decl."); Dkt. 9 ("Parks Decl."); Dkt. 11 ("Bigger Decl."); Dkt. 15 ("Ross Decl."); Dkt. 19 ("Eide 12/7 Decl.").

*Id.* ¶ 33.  One of those clients is Digital Ally, a company that sells digital-surveillance equipment and other law-enforcement-related products.  *Id.* ¶ 34.  By the start of 2025, Digital Ally allegedly accumulated a deficit of $117.7 million and was subject to a "going concern" opinion from its auditor about the company's possible inability to continue its operations.  *Id.* ¶¶ 40-41.

On February 13, 2025, Digital Ally retained Aegis to act as the sole, exclusive underwriter for a $15 million firm-commitment offering of Digital Ally's shares.  *Id.* ¶¶ 1, 39.  Under the parties' arrangement, Aegis bought 100 million common units and resold those shares to its customers, leading to $13.48 million in net proceeds for Digital Ally.  *Id.* ¶ 2.  The Underwriting Agreement includes a right-of-first-refusal provision, valid for three years, through which Digital Ally has committed to give Aegis "the right to act as sole book-runner, sole manager, sole placement agent or sole agent" should Digital Ally decide "to finance or refinance any indebtedness" and "the right to act as sole book-running manager, sole underwriter or sole placement agent" should Digital Ally decide "to raise funds by means of a public offering . . . or a private placement or any other capital raising financing of equity, equity-linked or debt securities." Compl., Exh. 1 ("Underwriting Agreement") § 5.15.  The provision gives Aegis ten days within receiving written notice, including a detailed term sheet, from Digital Ally of "its financing needs" to "accept" the "engagement," although Aegis may "waive[] its right of first refusal."  *Id.* According to the Complaint, for the commitment to receive approval from the Financial Industry Regulatory Authority ("FINRA"), "Aegis had to include the value of the" right-of-first-refusal provision "in calculating its cash compensation that it could charge" Digital Ally.  Compl. ¶ 42.

The Underwriting Agreement also has an "Equitable Remedies" section which specifies that "a breach or threatened breach" by Digital Ally "of any of its obligations" under the right-of-first-refusal provision "would give rise to irreparable harm" to Aegis "for which monetary damages would not be an adequate remedy."  Underwriting Agreement § 19.  That section entitles

Aegis "to equitable relief, including a temporary restraining order, an injunction, [and] specific performance" of the right-of-first-refusal provision without Aegis needing to "prove actual damages or that monetary damages will not afford an adequate remedy." *Id.*

Aegis alleges that Digital Ally breached or threatened to breach the right-of-first-refusal provision by entering "into binding contracts to raise $26 million without Aegis's knowledge, consent, or participation." Compl. ¶ 13. Those contracts would raise $1 million through "a Senior Secured Convertible 'Note' financing, with warrants and follow-on rights" and "$25 million more through a committed equity line of credit." *Id.* ¶ 14. Digital Ally asserts that it "did not engage an investment bank or underwriter in connection with" the challenged transactions, instead dealing directly with "an institutional investor, Yield Point NY, LLC." Ross Decl. ¶¶ 6-8. These transactions, Digital Ally claims, were intended to provide it "access to emergency cash necessary for its operations," as without that liquidity "its operations will be severely constrained, including without limitation, its ability to generate capital in future transactions." *Id.* ¶ 10.

Aegis learned of Digital Ally's purported breach on September 15, 2025, when Digital Ally publicly disclosed the challenged transactions through its Form 8-K filed with the Securities and Exchange Commission ("SEC"). Compl. ¶¶ 13-14. At that point, "Aegis immediately challenged" those transactions with Digital Ally. *Id.* ¶¶ 17, 58. Attached to the Complaint is a letter from Aegis's counsel to Stanton Ross, Digital Ally's Chairman and CEO, dated September 24, 2025, in which Aegis asserts that Digital Ally "failed to comply" with the right-of-first-refusal provision "in every material respect" because "[n]o written notice was provided; [n]o term sheet was delivered . . . ; [t]he contractual 10-day acceptance period was disregarded; and Aegis has issued no waiver, express or implied." Compl., Exh. 2 at 1. "Unless immediately cured," the letter continues, "this breach will leave Aegis no option but to pursue enforcement of its rights under the Underwriting Agreement." *Id.*

3

The parties then sought to voluntarily resolve the dispute. *See* Compl. ¶ 19; Ross Decl. ¶ 13. On October 1, 2025, Aegis emailed a proposed settlement agreement to Ross. Ross Decl. ¶¶ 14-15; *see* Ross Decl., Exh. E ("Proposed Settlement"). Under the Proposed Settlement, Digital Ally would agree to "pay to Aegis a fee equal to two percent (2%) of Gross Proceeds raised" through the challenged transactions, a fee which would apply "both to amounts already received by" Digital Ally and "for those to be received" through the end of the three-year right-of-first-refusal period. Proposed Settlement §§ 2.3, 2.4, 3.1. The Proposed Settlement also would entail an agreement that the Underwriting Agreement's right-of-first-refusal provision "remains in full force and effect . . . except that the Settlement Fee constitutes the agreed resolution of the past breach relating solely" to the challenged transactions, even though "no Party admits liability or wrongdoing." *Id.* §§ 4.1, 5.3.

Ross, concededly, did not sign and return the Proposed Settlement immediately. Ross Decl. ¶ 15. As he explains, his signing was delayed partly by his medical issues and partly "due to the government shutdown's impact on Digital Ally's registration obligations to Yield Point in connection with the Transactions." *Id.* ¶ 16. While Ross maintains that he "remained in contact at various points" with Robert Eide, Aegis's CEO, "regarding the settlement agreement," *id.* ¶ 17, Eide, for his part, says that he "cannot understand" how this correspondence led Ross to think the parties "had settled this dispute," Eide 12/7 Decl. ¶ 25; *see also* Eide 12/7 Decl., Exh. E ("Emails"). On November 25, 2025, Ross represented to Eide that he could sign the Proposed Settlement "on Tuesday [December 2, 2025]" but Eide responded that he was "beyond that now" and was "engaging counsel for all fees [Digital Ally] owe[s] due to [its] tortious breach of [Aegis's] contractual rights." Emails at 1.

The next day—November 26, 2025—Digital Ally filed Forms S-1, which are the challenged transactions' registration statements, with the SEC. Compl. ¶ 20. Aegis alleges that

4

as soon as the SEC declares the Forms S-1 effective, "the market will be flooded with approximately 74 million more" Digital Ally shares, thus "decimating the value" of the securities Aegis bought from Digital Ally and sold to its own investors. *Id.* ¶ 26. And the same day Digital Ally filed its Forms S-1, Ross signed the Proposed Settlement without edit and sent it to Eide. Ross Decl. ¶¶ 18-19. To date, Eide has not signed the Proposed Settlement on Aegis's behalf.

**B.      Procedural Background**

Instead of settling, Aegis commenced this action on November 30, 2025. Dkt. 1. The Complaint asserts a single cause of action against Digital Ally for breaching the Underwriting Agreement's right-of-first-refusal provision, claiming that the alleged breach "has caused Aegis no less than $2.08 million in damages before interest, costs, and contractually-mandated legal fees," and that Digital Ally's breach "also entitles Aegis to temporary, preliminary, and permanent injunctive relief that prohibits [Digital Ally] from further damaging Aegis's customers and goodwill." Compl. ¶¶ 85-92.

On December 1, 2025, Aegis filed its emergency motion for a temporary restraining order and a preliminary injunction, seeking to enjoin Digital Ally "from issuing any securities, assuming any debts, or otherwise taking any action in violation of" the right-of-first refusal provision. Dkt. 5 ("Proposed Order") at 1-2; *see* Motion; Eide 12/1 Decl.; Parks Decl.; Bigger Decl. Aegis further seeks to enjoin Digital Ally from filing or causing to file "any acceleration requests" for the Forms S-1 currently on file with the SEC, and for this Court to order that "the Forms S-1 cannot become effective" while proceedings are ongoing and for Digital Ally to "withdraw the Forms S-1" with the SEC. Proposed Order at 2.

That same day, the Court held a telephonic hearing on the emergency motion, at which Digital Ally appeared. *See* Dkts. 10, 12; December 1, 2025 Minute Entry. After that hearing, the Court ordered Digital Ally to file its response to the motion by December 4, 2025, and for Aegis

to file its reply, if any, by 12:00 p.m. on December 7, 2025.  Dkt. 12.  The Court further ordered

Digital Ally to give "two business days' notice" should it "file any acceleration request" with the

SEC "or take any comparable step to imminently consummate the challenged transactions" in the

meantime.  *Id.*

Digital Ally filed its response on December 4, 2025.  Dkt. 16 ("Response"); Ross Decl.

Aegis filed its reply shortly after noon on December 7, 2025.  Dkt. 18 ("Reply"); Eide 12/7 Decl.

On December 8, 2025, the Court held an in-person hearing on the motion, at which it overruled

Digital Ally's objection to considering Plaintiff's slightly belated reply and supporting papers,

Dkt. 20.

## II.  Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter*

*v. NRDC, Inc.*, 555 U.S. 7, 24 (2008).  To justify a preliminary injunction, a movant must show

"(1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a

serious question going to the merits to make them a fair ground for trial, with a balance of hardships

tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of

granting an injunction."  *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d

Cir. 2010) (citation modified) (citing *Winter*, 555 U.S. at 20).  This Court need not decide whether

the likelihood-of-success or serious-questions merits standard applies, because as explained below,

Aegis fails to show irreparable harm even assuming a likelihood of success on the merits.  *See,*

*e.g.*, *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 108

(2d Cir. 2025) (summary order) (explaining that where a movant "has failed to show that it will

suffer irreparable harm," courts need "not consider its arguments as to the other preliminary

injunction factors").  It is also "well established that the standard for an entry of a temporary

restraining order is the same as for a preliminary injunction."  *AFA Dispensing Grp. B.V. v.*

*Anheuser-Busch, Inc.*, 740 F. Supp. 2d 465, 471 (S.D.N.Y. 2010); *accord Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008).

### III. Discussion

"The irreparable harm requirement is the single most important prerequisite for the issuance of a preliminary injunction." *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C. ("State Farm")*, 120 F.4th 59, 80 (2d Cir. 2024) (internal quotation marks omitted). "To establish irreparable harm, the moving party must show an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *St. Joseph's Hosp. Health Ctr.*, 131 F.4th at 106 (internal quotation marks omitted). Put differently, an asserted injury is irreparable when it "cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *State Farm*, 120 F.4th at 80 (internal quotation marks omitted). As the Second Circuit has long explained, "contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate." *Baker's Aid, Inc. v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987). So while the irreparable-harm language in the Underwriting Agreement "may be entitled to weight," this Court must itself assess whether the asserted harm is irreparable, *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 673-74 (2d Cir. 2023)—as Aegis rightly concedes, Reply at 11.

Aegis's theory of irreparable harm is a moving target. In its Complaint and opening papers, Aegis relies primarily on the "loss of its investor-protective reputation, goodwill, and business opportunities." Compl. ¶¶ 77-83; Motion at 16-18; Eide 12/1 Decl. ¶¶ 71-75. But in its reply, Aegis shifts gears, focusing on the loss of the first-refusal right itself as irreparable without mentioning reputation, goodwill, and business opportunities at all. Reply at 8-12. Even assuming that both theories have been properly raised, *but see, e.g.*, *Bayer Schera Pharma AG v. Sandoz,*

*Inc.*, Nos. 08 Civ. 3710 (PGG), 08 Civ. 8112 (PGG), 2010 WL 1222012, at *6 n.11 (S.D.N.Y. Mar. 29, 2010) (explaining that a court usually "cannot rely on such arguments"), neither persuades.

Aegis's original theory of harm—the loss of reputation and goodwill—falls short here. While "a loss of prospective goodwill can constitute irreparable harm," the Second Circuit has explained that such loss is irreparable where "the very viability of the plaintiff's business or substantial losses of sales beyond those of the terminated product have been threatened." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995) (internal citations omitted); *see also Caruso Mgmt. Co. v. Int'l Council of Shopping Ctrs.*, No. 18 Civ. 11932 (VM), 2019 WL 1949801, at *4 (S.D.N.Y. Apr. 18, 2019) (explaining that instances of irreparable losses of goodwill are usually "paired with a corresponding loss of essential services that threaten the company itself" or "a meaningful loss of market share in a specific market"). Aegis does not suggest that the breach of this right-of-first-refusal provision threatens its existence. Nor does Aegis show that such a breach would "affect [its] reputation more generally, or have any spillover effect on any other product in [its] massive portfolio or on any other service it offers." *Sandoz Inc. v. Cediprof, Inc.*, No. 20 Civ. 5568 (VM), 2020 WL 4482634, at *4 (S.D.N.Y. Aug. 3, 2020). Indeed, Aegis's lone affidavit from a customer says, at most, that a banker like Aegis's insistence on a right of first refusal "becomes [his] path to participating in future transactions"; the customer does not, notably, say that the breach here would cause him to take his business elsewhere. Bigger Decl. ¶ 9; *see also id.* ¶ 2 ("I am a customer of Aegis and have invested millions of dollars with Aegis over the years.").

All that is left, then, are the Complaint's allegations that "[b]ecause investment banking and financial advisory services are extremely competitive, it is of the utmost importance that Aegis's clients have faith in the advice, strategies, and solutions that Aegis offers," such that

Digital Ally's breach of the right-of-first-refusal provision harms "Aegis's relationships with its clients by severely diluting the investments of the Aegis customers who participated in the Offering [with Digital Ally] and" its "hard-earned reputation as a solid partner for both its issuers and its customers." Compl. ¶¶ 79-81. But such allegations are conclusory, and it is well-established that "conclusory statements of loss of reputation and goodwill constitute an insufficient basis for a finding of irreparable harm." *Atari Interactive, Inc. v. Printify, Inc.*, 714 F. Supp. 3d 225, 238 (S.D.N.Y. 2024) (internal quotation marks omitted). And "even if" Aegis "were to suffer damages from loss of goodwill, the parties' long course of dealing will enable the calculation of such damages." *Sandoz*, 2020 WL 4482634, at *4; *see* Compl. ¶ 51 (explaining that the parties have included a right-of-first-refusal provision "in multiple previous contracts by which Aegis raised tens of millions of dollars for" Digital Ally); Eide 12/7 Decl. ¶ 15 (same). Because "the alleged loss of goodwill [is] doubtful" and any lost profits and fees can "be compensated with money damages determined on the basis of past" transactions "and of current and expected future market conditions," the Court finds "no irreparable harm" based on goodwill. *Tom Doherty Assocs.*, 60 F. 3d at 38; *accord Dexter 345 Inc. v. Cuomo*, 663 F. 3d 59, 63 (2d Cir. 2011).

The Court reaches the same conclusion for Aegis's right-of-first-refusal theory. Aegis argues that "New York's preferred ultimate remedy for a [right-of-first-refusal] violation is equitable relief: specific performance to compel compliance," such that "this Court may presume the existence of irreparable harm." Reply at 8-10 (collecting cases). But that argument "conflates the specific performance inquiry about an adequate remedy at law with the preliminary injunction inquiry into irreparable injury." *Westchester Fire Ins. Co. v. DeNovo Constructors, Inc.*, 177 F. Supp. 3d 810, 813 (S.D.N.Y. 2016) (Nathan, J.). Indeed, Aegis's "linkage" of irreparable harm "misconceive[s] the differing requirements for a grant of specific performance under New York law, and for the issuance of a preliminary injunction as established by the Second Circuit," as "a

claim for specific performance . . . in no way mandates a finding of irreparable harm as part of a determination of whether to grant a preliminary injunction." *Firemen's Ins. Co. of Newark, N.J. v. Keating*, 753 F. Supp. 1146, 1151-52 (S.D.N.Y. 1990).

In this case, any harm from the breach of the right-of-first-refusal provision is not irreparable because it can ultimately "be remedied by an award of monetary damages." *St. Joseph's Hosp. Health Ctr.*, 131 F.4th at 108 (internal quotation marks omitted). While it might be true, as a general matter, that the "loss of the [right of first refusal] cannot be quantified with money damages," *Thales Avionics, Inc. v. L3 Techs., Inc.*, 719 F. Supp. 3d 337, 347 (S.D.N.Y. 2024), that is not the case here. To the contrary, the parties were able to quantify the first-refusal right in at least three instances: when obtaining FINRA's approval of the Underwriting Agreement, Compl. ¶ 42, in calculating at least $2.08 million in lost underwriting fees as "compensatory damages," *id.* ¶¶ 30, 52, 91, and in setting a Settlement Fee for the alleged breach, Proposed Settlement §§ 3.1, 4.1. Aegis challenges the relevance only of the FINRA estimate, but not the others. *Compare* Reply at 10 ("FINRA's decision to assume all [rights of first refusal's] value is identical, regardless of any given clause's specific terms or facts, only further shows how difficult it is to quantify the [instant right of first refusal]."), *with* Opposition at 7-8 ("Nor does Plaintiff contend that the amount of alleged damages could not reasonably be calculated; to the contrary, Plaintiff purports to have already done the calculation, alleging that it is entitled to at least $2.08 million in purported underwriting fees as 'compensatory damages.'"). And to the extent that Aegis asserts that any quantifications were simply rough estimates, "[m]onetary compensation need only be adequate for preliminary relief to be unwarranted, not perfect." *Joseph's Hosp. Health Ctr.*, 131 F.4th at 106 (internal quotation marks omitted). Just so here.[2]

---

[2] While Aegis also argues that the challenged equity line of credit's structure "would enable" Digital Ally "to not have to raise any more money . . . for the remaining 2+ years of

Finally, Aegis's argument that Digital Ally's near-insolvency is "reason enough to find irreparable harm," Reply at 11-12, is incorrect. "Undocumented allegations about the potential inability of defendant to satisfy a final judgment cannot serve as the basis for an award of injunctive relief." *Everest Cap. Investments Ltd. v. Editek, Inc.*, No. 96 Civ. 5837 (RLC), 1996 WL 695794, at *4 n.3 (S.D.N.Y. Dec. 4, 1996). Indeed, "courts have found the mere fact of filing for bankruptcy insufficient to establish irreparable harm absent evidence that a plaintiff would actually be unable to collect on a judgment against a defendant." *Westchester Fire Ins. Co.*, 177 F. Supp. 3d at 814; *see also Holford USA Ltd. v. Cherokee, Inc.*, 864 F. Supp. 364, 371 (S.D.N.Y. 1994) (explaining that the "mere fact that [a plaintiff] may recover less than its entire loss with respect to any injury previously inflicted on it by [the defendant] does not constitute irreparable injury for purposes of determining [the plaintiff's] right to injunctive relief"). Aegis presents no such evidence, nor could it: the challenged transactions make it *more* likely that Digital Ally will compensate Aegis with money damages for any breach of the right-of-first-refusal provision at the close of this case, not less. *See* Ross Decl. ¶ 10 (explaining that the transactions will give Digital Ally liquidity "necessary for its operations," including "its ability to generate capital in future transactions"). That irony dooms Aegis's argument.

"[I]t is settled law that when an injury is compensable through money damages there is no irreparable harm." *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990). Without irreparable harm, Aegis's request for a temporary restraining order and a preliminary injunction comes up short. *See Joseph's Hosp. Health Ctr.*, 131 F.4th at 108 (collecting cases).

---

Aegis's" right of first refusal, Motion at 3, that argument for irreparable harm is speculative at best.

11

## IV.  Conclusion

For these reasons, Aegis's motion for emergency relief is denied.  The Clerk of Court is respectfully directed to close Docket Number 5.

SO ORDERED.

Dated: December 9, 2025
New York, New York

JOHN P. CRONAN
United States District Judge